BUCK, The (LANE v.). See Case No. 8,048.

BUCK (ROBERTS v.). See Case No. 11,897.

BUCK (UNITED STATES v.). See Case No. 14,680.

---

## Case No. 2,083.

### BUCKER v. KLORKGETER.

[1 Abb. Adm. 402.][1]

District Court, S. D. New York. Jan. Term, 1849.

ADMIRALTY JURISDICTION — FOREIGN SEAMEN — SHIPPING ARTICLES—AGREEMENT NOT TO SUE—RIGHT TO SUE FOR WAGES — UNSEAWORTHINESS OF VESSEL.

1. The maritime courts of this country and of England are not without jurisdiction over actions, whether in rem or in personam, between foreigners. But as a general rule, both the American and English courts will decline to entertain such actions, excepting where it is manifestly necessary that they should do so, to prevent a failure of justice.

[Cited in The Russia, Case No. 12,168.]

[See note at end of case.]

2. A stipulation in shipping articles, by which the master and crew of a foreign vessel, about to sail to this country, agree that they will not sue in any courts abroad, but will refer all disputes to the courts of their own country for adjudication, is lawful and binding, and will, in general, be respected and enforced by the American courts. But where the interests of justice require it to be disregarded—e. g., where the voyage is broken up in an American port, by some other cause than the wreck of the vessel, or where the man is discharged or becomes entitled to a discharge by reason of improper treatment—the American courts will entertain a suit by a foreign seaman for his wages, notwithstanding his stipulation in the articles not to sue until his return home.

[Cited in The Elwin Kreplin, Case No. 4,427; The Hermine, Id. 6,409; The Lilian M. Vigus, Id. 8,346.]

[See note at end of case.]

---

[1] [Reported by Abbott Brothers.

3. Under the practice in this country, the approval of the consul, or other representative of the nation to which foreign seamen belong, is not absolutely necessary to the maintaining of a suit between them.

4. It seems that a deviation from the voyage for which foreign seamen shipped, is not a ground upon which our courts should entertain jurisdiction of a suit for wages, where, by the articles, the libellants have stipulated to sue in their own country only.

[Referred to in The Becherdass Ambaidass, Case No. 1,203, as not announcing any general rule, but rather suggesting important exceptions to a sound rule.]

5. Unseaworthiness of a vessel releases the crew from obligation to sail with her; and on showing such condition of the vessel, and that they left her on that account, they may maintain an action in personam for wages here, although all parties are foreigners, and are under agreement not to sue while abroad.

[Cited in The Heroe, 21 Fed. 528.]

6. A report that a ship is seaworthy, made by marine surveyors, upon occasion of the crew demanding to leave her for unseaworthiness, is not conclusive against the crew, in a subsequent action for wages, after leaving.

In admiralty. This was a libel in personam, by Gerhard Bucker against Henry Klorkgeter, master of the bark Pacific, to recover wages as seaman. The libellant, a foreigner, shipped at Bremen on board the Pacific, for a voyage to New York, elsewhere and back. Articles to that effect were signed by him. The original agreement and an admitted translation of it were put in evidence in the cause. By the terms of the agreement, the libellant bound himself, under penalty of forfeiture of wages, not to leave the vessel abroad, and not to ask his dismissal nor any wages due, of foreign courts; and also agreed, that if any difference arose between himself and the master, he would bring no action therefor, excepting in the courts of Bremen, after the end of the voyage; and that he would appear in the courts of Bremen and await their sentence in reference to his services and duties. The Pacific, after arriving at New York, was despatched to Havana, and returned thence to New York. The libellant performed both voyages in her. She was then loaded and made ready for a voyage to Madeira. While she was lying in the North river, the crew, including the libellant, refused to go in her, alleging that she was unseaworthy, and they demanded a survey. Marine surveyors were accordingly called in to examine the ship. After trying the pumps, and finding that although she leaked, she did not make water so fast but that she could be kept free with about five minutes working of the pumps per hour, they certified that she was seaworthy. The respondent and the Bremen consul then required the crew to make the voyage; but they, including the libellant, refused to go in her, still insisting that she was unsafe and unseaworthy. Another crew was then shipped and the bark put to sea. In about five days she returned in distress. She had encountered heavy weather during this absence, in which she was much strained. A more careful survey was then had, and she was pronounced unseaworthy; and her cargo being unladen and her hull examined, she was found rotten throughout, and not worth repairing. Her hull and masts were sold at auction for $25, and on the same day were resold by the purchaser for $200, to be broken up, they being found useless for any other purpose.

The respondent refused to pay the libellant his wages, and no provision was made by the Bremen consul for his support here, or for his return home.

E. C. Benedict, for libellant.

I. The crew were under no obligation by the articles to go with the vessel to Madeira. The articles did not bind them to return to New York after leaving it for another port; nor were they bound to go from New York to more than one other port. This obligation they had already fulfilled by the trip to Havana; and the attempted voyage to Madeira was a deviation from that contemplated by the articles. II. The stipulation in the articles referring all matters in dispute to the Bremen courts, rests evidently upon the assumption that the vessel would return to Bremen. The contract is, that the libellant will bring no action except in the courts of Bremen, after the end of the voyage. This contemplates a return to Bremen; and the stipulation can have no application under an emergency wholly unprovided for by the articles, namely, the entire breaking up of the voyage in this country. III. The failure of the voyage by the unseaworthiness of the ship brings the case within a well-recognized exception to that general doctrine, that the courts of this country will not interfere in the disputes of foreigners. The seamen had a right to leave the vessel if she was unseaworthy. It is true the presumption is against them upon this point; but if upon the trial the libellant has proved her unsafe at the time when he left her,—which has clearly been done,—he has established his right to refuse to sail. The certificate of the first surveyors does not prevent libellant from showing the ship to have been in fact unfit to sail.

T. Tucker, for respondent.

I. The stipulation in the articles is lawful, and should be enforced in this court by a dismissal of the suit. Thompson v. The Catharina [Case No. 13,949]; Willendson v. The Forsoket [Id. 17,682]. II. Moreover, this court will not take cognizance of controversies between foreigners, even in the absence of such agreement. III. The certificate of the surveyors upon the first survey was conclusive upon the men, as to the condition of the vessel. That she was afterwards found unseaworthy is not surprising, nor is it inconsistent with the truth of the

first certificate, when the evidence as to the weather encountered by her during the attempted voyage to Madeira is taken into view. The leaving the vessel after the surveyors had reported her in good condition was a forfeiture of the wages claimed.

BETTS, District Judge. An exception is taken on behalf of the respondent to the jurisdiction of the court in this case, upon two grounds:—

1. Upon the general ground that maritime courts will not entertain suits for wages brought by foreign seamen against foreign masters or owners.

2. Upon the terms of the shipping articles, by which the libellant agreed that if any difference arose between him and the respondent, he would bring no action therefor, except in the courts of Bremen, after the end of the voyage; and that he would appear in the courts of Bremen, and await their sentence, in reference to his services and duties.

In respect to the question raised by the first objection, it is sufficient to say, that the nature and limits of the jurisdiction of admiralty courts of the United States over suits between foreigners have been several times brought under careful consideration in this court. And while I recognize very sufficient reasons why our courts should, in general, decline to take jurisdiction of such controversies, yet I am clear that the power exists, and that the court may hear and determine an action of this description between foreigners, whenever the general interests of justice demand that it should be done. The reasons for this view were fully stated in Davis v. Leslie [Case No. 3,639]. See, also, The Napoleon [Case No. 10,015]; The Infanta [Id. 7,030]; One Hundred and Ninety-Four Shawls [Id. 10,521].

A further question arises, however, upon the effect of that stipulation in the shipping articles which limits the libellant, in case of controversy, to a resort to the courts of Bremen for redress.

Such stipulations in the shipping articles are regarded by the American courts as valid. A contract by which the seaman binds himself not to sue in any case, or not to sue in the proper court, or in the courts of his own country, is not to be supported. But a stipulation in a shipping contract between foreigners, by which the parties bind themselves not to sue in the courts of their own nation, is lawful and should be sustained. Thompson v. The Catharina [Case No. 13,949]. And I believe it to be the recognized doctrine, as now established in our courts, in respect to suits by foreign seamen for their wages, where the shipping contract contains a provision of this kind, that if the contract remains in force, and the voyage is yet unended, the courts will decline jurisdiction, especially if the suit is not sanctioned by the representatives, dip-

lomatic or commercial, of the nation to which such seamen belong. Abb. Shipp. 786, and note; Curt. Merch. Seam. 359, and note.

The English and American tribunals, however, never decline jurisdiction in these cases, when the voyage is broken up, or the seamen discharged, or other emergency has occurred, entitling them clearly to their wages. A leading authority on this point is the case of The Wilhelm Frederick, 1 Hagg. Adm. 138, between which and the case now before me are many points of resemblance. That cause was instituted against the ship by the seamen for their wages. The owners appeared under protest to the jurisdiction, based on the following facts: The owners were subjects of the king of the Netherlands, and the ship was a Dutch ship. Previous to sailing from Amsterdam, the crew had stipulated by the shipping articles that none should have a right to take proceedings at law against the master in foreign ports, but all disputes and complaints against the master should be settled or prosecuted on arrival in their own country. In case the ship while abroad should be sold, or condemned, or the continuation of the voyage be suspended, so as to render it necessary to discharge the crew, the master was to make a settlement with every one upon terms prescribed in the articles, and no one should claim a larger sum; and in case the master should be remiss in the performance of his duty, the injury was to be made good at Amsterdam. On the arrival of the ship at Cowes, she was surveyed; and, in consequence of the damage she had received, was found to be utterly unable to proceed on her voyage, the further prosecution of which was, therefore, abandoned, and the men discharged on a tender of wages and a passage home, which they refused. The owners abandoned the ship to the discretion of the master, who assigned her in trust to pay the wages, and for other purposes. The protest to the jurisdiction was overruled. Lord Stowell says: "The owners had abandoned the ship to the discretion of the captain, who assigns her over to British creditors at Cowes. Here, then, was a disclaimer by the owners of their own articles of agreement; their contract with the seamen was at an end; and I am satisfied that the seamen may, under these circumstances, proceed on the general law to establish their claims."

On similar grounds, actions by foreign seamen for wages have been sustained, notwithstanding such stipulations, by the English common-law courts. In Sigard v. Roberts, 3 Esp. 71, and in Limland v. Stephens, Id. 269, the plaintiffs were under articles which contemplated a settlement of disputes between the master and crew in the courts of their own country only; yet in both these cases the action in the court of king's bench was sustained, upon the ground, in the first

case, that the master had discharged the seamen; and, in the second, that the seaman had received ill treatment from the master, which entitled him to a discharge. This jurisdiction is also sustained by a dictum of Mr. Justice Le Blanc, in Hulle v. Heightman, 4 Esp. 75. But see Gienar v. Meyer, 2 H. Bl. 603.

In the courts of the United States the same course has been followed; and while, in general, our courts will respect and enforce a stipulation between a foreign master and his crew, which limits them to suing in their own country, they have frequently asserted both the power and the willingness to grant relief to a seaman, notwithstanding such an agreement, whenever the interests of justice demand that they should do so. Cases in which the voyage was broken up or ended in this country, or in which the men were discharged here, have been specified as those in which the courts would most readily enforce the payment of wages due, although, by the strict letter of his contract, the seaman was forbidden to ask their aid. Aertsen v. The Aurora [Case No. 95]. In one respect, indeed, the American courts show a greater favor to seamen, in these cases, than do the courts of Great Britain; for the former proceed, irrespective of any interference on behalf of the seaman by his consul or other national representative, whilst the English courts would seem still to insist that the sanction of such an officer to the action shall be procured, unless the nature of the case forbids. The Wilhelm Frederick, 1 Hagg. Adm. 138; Edw. Adm. Jur. 128.

I am clear that, notwithstanding a stipulation of this sort, the courts of the United States are open for the protection of foreign seamen, left destitute within their jurisdiction, by improper discharge, or by the breaking up of the voyage for any other cause than the wreck of the vessel.

I have never been disposed, however, to entertain jurisdiction in those cases in which the ground upon which the court is asked to disregard the stipulation prohibiting the suit is a deviation of the foreign ship from the voyage contemplated in the articles. Judge Peters has, indeed, intimated that a gross deviation would be a legitimate ground for the interposition of the local courts. Moran v. Baudin [Case No. 9,785]. And see Weiberg v. The St. Oloff [Id. 17,357]. But I have always considered questions of deviation to be fitly referable to the home tribunals. They are best able to determine what the obligations and rights of the respective parties may be under the apparent change of the agreement.

I should not, therefore, entertain this action because of the proposed voyage to Madeira, upon which the bark entered, and her deviation thereby from the voyage described in the shipping agreement; and had the point been the right of the libellant to leave the vessel for that cause, I should have referred him to the courts of Bremen for redress.

This is not the case, however. The crew refused to serve on board, because of the unseaworthiness of the ship. They left upon that allegation, openly, and with the knowledge of the master and consul. This circumstance, also, takes away from their departure the character of a desertion, endeavored to be given to it by the defence. If done unwarrantably, the men may have incurred, under the law maritime, a penalty equivalent to the value of their wages; but the refusal to go to sea in a ship found to be leaking constantly, and which they desired to leave for no other cause, would not amount to a technical desertion. I think, therefore, that neither the position taken in favor of the libellant that he could rightfully abandon the vessel because of her deviation from the voyage agreed upon, nor that, on the part of the respondent, that the refusal to sail was a desertion, and involved a forfeiture of the right to wages, is maintainable.

The case then turns upon the question, whether the vessel was unseaworthy at the time of the libellant's refusal to sail in her; and I think it clear upon the evidence that she was. The slight and exceedingly unsatisfactory examination made by the marine surveyors, on giving their certificate of seaworthiness, even if it could operate to put the men in the wrong, in case no facts had afterwards been brought out respecting the condition of the vessel, cannot, nor can their formal certificate, avail against the clear and indubitable evidence furnished within a week after that the ship must have been at that time totally unsafe to undertake the voyage she was to enter upon.[2] It is alleged that she encountered heavy weather in the short time during which she was out, and was greatly strained in it; yet if the fact were so, the state of the weather would have no connection with the condition of entire rottenness in which her whole body was found on her return. It cannot, upon the proofs, be matter for question, that the ship was not merely unseaworthy in a nautical sense, but was moreover unfit and unsafe for any navigation whatever.

The libellant took the risk of making out the unseaworthiness of the vessel, in justification of his refusal to remain by her; and having done so completely, under circumstances demonstrating that such was her condition when he asserted it and left her, he is entitled to every advantage that can arise from the clear establishment of that fact afterwards, with the same effect as if it had been brought to light at the time of her sailing. Manifestly one consequence is, that he was released from all obligation or

---

[2] On the effect of a marine survey, see the authorities cited by Smith, arguendo, in The Lucinda Snow [Case No. 8,591].

duty to go to sea in her. And it follows no less certainly that the voyage being broken up because of the destruction of the ship for rottenness, the libellant is entitled to his wages upon his contract, as upon its full and faithful performance on his part. The stipulation to refer all actions to the Bremen courts, contained in the articles in this case, relates, by its terms, to an anticipated ending of the voyage at that port. It cannot be accepted as governing the case of an entire breaking up of the voyage in a foreign country, by a sale of the ship, as in this instance, for incapacity to prosecute and complete it. To give that effect to the contract would be not only wrongful and oppressive to the seamen, but would render it deceptive and fraudulent in respect to their rights and remedies, inasmuch as the master would have it in his own power, by disposing of his vessel abroad, to cut them off from all recovery of wages. The master abandons the vessel in this port as worthless, and leaves the libellant to take care of himself;— accordingly he is liable for wages already earned for the necessary support of the libellant here, and for means sufficient for his return home. It must be referred to a commissioner to ascertain these amounts, giving the respondent allowances for past payments, and for the earnings of the libellant since he left the vessel.

Decree accordingly.

[NOTE. Courts of admiralty, while not bound to take jurisdiction in matters of controversy between foreigners, will do so where justice requires it. The Sailor's Bride. Case No. 12,220; The Bee, Id. 1,219; The Havana, Id. 6,226; Thomassen v. Whitwell, Id. 13,928; Davis v. Leslie, Id. 3,639; Mason v. The Blaireau, 2 Cranch (6 U. S.) 240; The Maggie Hammond, 9 Wall. (76 U. S.) 435; Boult v. The Naval Reserve, 5 Fed. 209; Willendson v. The Forsoket, Case No. 17,682; Bernhard v. Green, Id. 1,349; The Belgenland, 9 Fed. 576; The Noddleburn, 30 Fed. 142; Orr v. The Achsah, Case No. 10,586. Urgent reasons or special circumstances should exist. Fry v. Cook, Id. 5,-138; The Carolina, 14 Fed. 424; The Montapedia, Id. 427; Thomson v. The Nanny, Case No. 13,984; The Pacific, Id. 10,644; Graham v. Hoskins, Id. 5,669; The Becherdass Ambaidass, Id. 1,203; One Hundred and Ninety-Four Shawls, Id. 10,521; Saunders v. The Victoria, Id. 12,377; Gonzales v. Minor, Id. 5,530. See The Elwine Kreplin, Id. 4,426; The Amalia, 3 Fed. 652. As the breaking up of the voyage or the unlawful discharge of the seaman. The Infanta. Case No. 7,030; Lynch v. Crowder, Id. 8,637; Saunders v. The Victoria, Id. 12,377; Thompson v. The Catharina. Id. 13,949; The Napoleon, Id. 10,015; The Lilian M. Vigus, Id. 8,346; Willendson v. The Forsoket, Id. 17,682. And see Davis v. Leslie, Id. 3,639; The Hermine, Id. 6,409; The Pawashick, Id. 10,851. Or where the seaman's contract has been broken by cruel and unwarrantable treatment. Weiberg v. The St. Oloff, Id. 17,357. A deviation such as to entitle a seaman to his discharge will justify the interference of admiralty. Moran v. Baudin, Id. 9,785. The remedy, however, should be no greater than the party would have been entitled to in the foreign jurisdiction. The Infanta, Id. 7,030; Thompson v. The Catharina. Id. 13,949. Comity is no reason for declining jurisdiction. The Russia, Id. 12,168; Fry v. Cook, Id. 5,138. And see Thomassen

v. Whitwell, Id. 13,928. Having taken jurisdiction, the proceeds should be distributed according to the rights of the parties. Covert v. The Wexford, 3 Fed. 577.]